[No. B173008. Second Dist., Div. Seven. June 28, 2005.]

AI PING LU, Plaintiff and Appellant, v.
RAVINDER S. GREWAL et al., Defendants and Respondents.

## Counsel

J. Steven Kennedy; and Kent M. Bridwell for Plaintiff and Appellant.

Richard Pech for Defendants and Respondents.

## OPINION

**ZELON, J.**—Plaintiff and appellant Ai Ping Lu (appellant) appeals from a judgment in favor of defendants and respondents Narinder Singh Grewal and Ravinder S. Grewal (respondents) following a bench trial. Lu sued the Grewals for unpaid rent and other damages as a result of the breach of a commercial lease when respondents abandoned the subject property. The trial court entered judgment for respondents in spite of their breach, finding the appellant suffered no damages because she and her husband occupied the premises, managed to run the business at a profit, and mitigated damages well above the amount of damages owed by respondents.

Appellant contends, among other things, (1) the purpose of Civil Code section 1951.2 is to encourage productive use of vacant commercial property after abandonment, (2) section 1951.2 contemplates mitigation only in terms of efforts to relet the vacant premises, (3) at the very most, respondents were entitled to an offset measured by the property's reasonable market rental value, and (4) appellant was the true prevailing party at the conclusion of trial. For the reasons discussed hereafter, we conclude appellant is entitled to recover damages with mitigation based on the fair market rental value of the property. Accordingly, we reverse and remand for further proceedings in accordance with the views hereafter expressed.

### *FACTUAL AND PROCEDURAL BACKGROUND*

The following factual background was not in dispute. In July 1993, respondent Narinder Singh Grewal, as lessee, entered into a written lease for a gas station located at 2050 West Manchester Boulevard in Los Angeles.[1] Respondent Ravinder S. Grewal, brother of Narinder, was the guarantor of payment obligations under the lease. The 10-year lease commenced July 1, 1993, and expired June 30, 2003. Rent was $5,000 per month the first year, $5,500 per month the second year, and each year thereafter (years three through 10) the monthly rent was "increased by a flat 5% over the monthly installment paid during the previous 12 month period."

In June 1997, Narinder Grewal assigned the lease to Mepco Oil, Inc. The written assignment of lease did not release respondents from their original obligations under the lease.

---

[1] The original lessors were Mehdi Rezaian, Fateme Rezaian, Nasser Ebrahimian and Rezvan Ebrahimian.

In August 2000, appellant purchased the gas station and adjacent service bays for $786,625.[2] The business was incorporated under the name China Petrol Inc. and appellant was sole shareholder, director and officer. Appellant received only one rental payment for September 2000 from Mepco Oil. Thereafter no rent was paid either by respondents or Mepco Oil. In October 2000, appellant's husband George Beliciu discovered Mepco Oil was gone. The premises had been vandalized; gas pumps had been removed leaving only holes in the ground filled with gasoline. Computer controls for underground tanks were ripped out of the walls, wires had been cut, a point-of-sale computer was missing and everything inside the convenience store was missing, broken or moved.

Faced with property that was vacant, damaged and unproductive, appellant and her husband occupied the property, made necessary repairs, and began to operate the business themselves. Her husband became the manager and both worked at the business operating (except for one brief period) 24 hours a day, seven days a week, "practically sleeping in the gas station." Appellant claimed no profit was made the first three months but later the business began generating a profit. Appellant continued to attempt to relet or sell the property. ARCO and Exxon oil companies, among others, were contacted to see if there was any interest but declined to lease the property.

In early 2001 and again in 2002, appellant signed two listing agreements for the sale of the property. Appellant entered into escrow to sell the property for $1.45 million on October 19, 2002, but the sale did not close.

The lease, under article 10.1, required respondents to "maintain the subject premises and every part thereof, structural and non-structural, in good order and repair, whether or not the need for repair and maintenance occurs as the result of Lessee's use, any prior use, the elements, or the age of the premises."

Further, article 11.1 provided that "Lessee shall indemnify and hold Lessor and Lessor's property harmless from and against any and all claims and related expenses arising from or related to Lessee's use of the subject premises, or from the conduct of Lessee's business or from any activity or work performed or permitted by Lessee or Lessee's employees and agents, at the subject premises or elsewhere, and . . . Lessee hereby assumes all risk of property damage and personal injury on or about the subject premises arising from any cause and hereby waives all claims in respect thereof against Lessor."

---

[2] The service bays at 2054 and 2058 W. Manchester and two parking spaces were separate and not included in the lease.

Appellant filed a claim for breach of the lease on October 7, 2002. Appellant operated the business throughout the remainder of the lease period and continued to do so up to the time of trial. A first amended complaint (FAC) was filed July 23, 2003, shortly after expiration of the lease term. The FAC stated causes of action for breach of contract including unpaid rent plus late charges, other specified damages, and damages resulting from removal of property and fixtures from the premises. Appellant also sought declaratory relief to establish respondents' breach and liability for damages. Respondents filed an answer asserting a general denial and setting forth five affirmative defenses: failure to state a cause of action, comparative negligence, waiver, failure to mitigate and unclean hands. Respondents argued appellant could not recover damages if she received more revenue from operating the premises than she would have under the lease.

At trial, respondents admitted the property had been abandoned during the lease term and that no rental payments were made over a period of several years. The only issue involved the amount of damages that was recoverable. Appellant presented evidence showing unpaid rent and late fees from October 2000 to June 30, 2003. Respondents did not dispute appellant's damages of unpaid rent; instead, they claimed a setoff based on mitigation pursuant to Civil Code section 1951.2. Appellant asserted that fair market rental value was the proper measure of mitigation; respondents contended that mitigation could properly be based on either operational profits or increased value as demonstrated by sale valuation.

At trial, appellant presented evidence of the property's fair market rental value by way of expert testimony from Alan Wallace, an attorney and real estate broker, and Scott Olson, a real estate broker specializing in the sale of gas stations. Although Mr. Olson was originally contacted by respondents' attorney to provide a lease value for the property, he was subpoenaed by appellant and testified that he inspected the property, looked at comparable leases, obtained a property profile from a title company and based on his knowledge of the industry concluded the property had a fair market rental value of $5,500 a month. Respondents presented no testimony concerning rental value; instead their expert, CPA Jason Engel, made assumptions concerning operations in order to conclude that profits generated during the period of time from approximately October 2000 to June 2003 far exceeded any lease obligation. His testimony, in large part, was critical of and responsive to the analysis prepared by appellant's expert, CPA Barry Charles, that in turn was designed to meet respondents' mitigation theory.[3]

---

[3] Respondents assert that the presentation of Mr. Charles's evidence, and argument related thereto, estops appellant's arguments on appeal by application of the principle of invited error. Because the facts do not support that argument, we will address this case on the merits.

The trial court chose to adopt the theory suggested by respondents that appellant fully mitigated her damages by deriving a profit from the operation of her business despite respondents' breach. The trial court held "[a]ny damages by reason of the breach of the lease were far less than the profits made by [appellant] and her husband, from the operation of the gas station and minimarket after the breach of the lease during the lease period. [¶] As such, judgment is entered on behalf of [respondents] with attorney's fees and costs in favor of [respondents] to be determined." Appellant was denied relief altogether and respondents were awarded costs and legal fees in the amount of $214,322.36.

Appellant filed a timely notice of appeal from the judgment and post-judgment award of costs and attorney fees.

### DISCUSSION

#### 1. Standard of review

■ The facts relevant to the issues that must be determined on this appeal are undisputed. Rather, this appeal involves interpretation of statutory law, in particular the application of Civil Code[4] section 1951.2 to this case. Matters of interpreting and applying statutes are questions of law. We therefore review de novo the judgment entered below. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

#### 2. Civil Code section 1951.2

■ In 1970, the California Legislature enacted section 1951.2 to address the issue of a landlord's rights and remedies in response to a tenant's abandonment of the property. Under the common law in effect prior to the enactment, the breach of the lease, if treated as a termination, ended the lessee's obligation to pay rent, forcing a lessor to abandon its claim. If the lessor opted not to terminate, the choices were also limited: sue on each monthly rental payment as it came due; or re-lease for the benefit of the tenant. See Comment, *Landlord-Tenant Legislation: Revising an Old Common Law Relationship*, 2 Pacific L.J. 259, 261–263 (1971). Section 1951.2 provides that abandonment of the premises results in de facto termination of the lease. This automatic termination of the lease converts a landlord's continuing right to rent under the lease into a damage claim for rent lost through the tenant's abandonment.

■ Section 1951.2 also governs the amount which a lessor may receive in damages from a lessee who breaches a lease as follows: "(1) The worth at

---

[4] All statutory references are to the Civil Code unless otherwise stated.

the time of award of the unpaid rent which had been earned at the time of termination; [¶] (2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could have been reasonably avoided; [¶] . . . [¶] (4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform [its] obligations under the lease or which in the ordinary course of things would be likely to result therefrom."

Here, it is undisputed that the property was abandoned during the lease term in October 2000 and that no rental payments were made for the remaining term. At trial, respondents claimed, and the trial court agreed, respondents were entitled to full mitigation credit for the profits generated by appellant's operation of her business thereby offsetting any award due appellant. Appellant contends, however, the correct measure for mitigation credit is the property's fair market rental value. We agree.

### 3. *Mitigation of damages in this case*

In an action for breach of contract, the measure of damages is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom" (§ 3300), provided the damages are "clearly ascertainable in both their nature and origin." (§ 3301.)

Under section 1951.2, a lessor may recover damages only to the extent unpaid rent exceeds "the amount of such rental loss that the lessee proves could have been reasonably avoided." (§ 1951.2, subd. (a)(2), (3); see § 1951.2, subd (c)(1).) The rationale for this law, changing the ability of a lessor to recover damages in the event of a lessee's breach, was to permit recovery in a more straightforward manner than prior common law permitted. While simplifying recovery, however, the Legislature recognized that a lessee should be credited with amounts that could have been obtained on a reasonable attempt to re-lease the property. Accordingly, "the basic measure of the lessor's damages should be made the loss of the bargain represented by the lease—*i.e.* the amount by which the unpaid rent provided in the lease exceeds the amount of rental loss that the lessee proves could have been or could be reasonably avoided." (Recommendation Relating to Real Property Leases (Nov. 1969) 9 Cal. Law Revision Com. Rep. (1969) p. 160.) The burden of proof rests with the lessee: "In determining the amount recoverable under paragraphs (2) and (3) of subdivision (a), the lessee is entitled to have offset against the unpaid rent not merely all sums the lessor has received or will receive by virtue of a reletting of the property which has actually been accomplished but also all sums that the lessee can *prove* the lessor could have obtained or could obtain by acting

reasonably in reletting the property. The duty to mitigate the damages will often require that the property be relet at a rent that is more or less than the rent provided in the original lease. The test in each case is whether the lessor acted reasonably and in good faith in reletting the property." (9 Cal. Law Revision Com. Rep., *supra*, p. 164.)

■ "A plaintiff cannot be compensated for damages which he [or she] could have avoided by reasonable effort or expenditures . . . . [¶] The doctrine does not require the injured party to take measures which are *unreasonable or impracticable* or which would involve expenditures disproportionate to the loss sought to be avoided or which may be beyond his [or her] financial means." (*Green v. Smith* (1968) 261 Cal.App.2d 392, 396–397 [67 Cal.Rptr. 796], italics added.)

■ Further, the measure of appellant's recoverable damages is not limited to damages for loss of rent. Appellant is also entitled to any other damages caused by the breach. "As the legislative committee comment to [section 1951.2] makes clear, the lessor, in addition to lost rent, is entitled to 'all of the other damages a person is entitled to recover for the breach of a contract . . . .' [Citation.] Thus, [appellant] is entitled to any other damages caused by the breach . . . and *any other special damages* incurred as a proximate result of the breach." (*Sanders Construction Co. v. San Joaquin First Fed. Sav. & Loan Assn.* (1982) 136 Cal.App.3d 387, 401 [186 Cal.Rptr. 218], italics added, fn. omitted.) Hence, appellant may seek unpaid rent and consequential damages, namely "the full benefit of its bargain." (*Id.* at p. 402.) For example, to the extent appellant would not have had to incur such expenses had respondents performed under the lease, appellant is entitled to reasonable expenses in retaking possession of the property, in making repairs respondents were obligated to make, in preparing the property for reletting, and damages for breach of specific covenants of the lease—a promise to maintain or restore the premises upon termination of the lease.

Several courts have dealt with mitigation under section 1951.2 in terms of reletting the abandoned property. No California court, however, has approved the profit based measure of mitigation applied in this case. Here, appellant restored the property and devoted substantial efforts to running a business there to avoid the wasteful prospect of leaving the property unattended and unproductive. Although she made efforts to re-lease the premises, they were unsuccessful. As a result appellant's damages are the loss of the bargain represented by the lease (i.e., $5,500 per month plus an additional 5 percent each year for years three through 10) plus any consequential damages proved

to the court, less any amount in mitigation that lessee proved.[5] (*Willis v. Soda Shoppes of California, Inc.* (1982) 134 Cal.App.3d 899, 905 [184 Cal.Rptr. 761].)

■ Respondents are not entitled to the benefit of appellant's hard work and capital in making the property productive; nor should appellant be punished for bringing the abandoned property back to life. An owner of commercial real property is not required, by virtue of a tenant's breach, to run the business located there at the expense of using time and capital to run a business elsewhere. A tenant has an interest neither in the value of the land, nor in the value of the landowner's business ventures. A tenant's right not to pay damages for rent that he proves could have been earned had the property been re-leased at fair market value does not convert a landowner's ability—or inability—to successfully run a business into an offset against the tenant's breach. And, just as a landlord, after the enactment of section 1951.2, has no obligation to re-lease the property for the benefit of the tenant to recover lost rent, that landlord has no obligation to run the business on the property for the tenant's benefit.

■ The contrary interpretation, upon which the trial court relied for its decision, defies principles of public policy and offends notions of fairness, justice and common sense. ■ "Statutes are to be interpreted so as to avoid absurd results . . . . [T]he legislative scheme [of section 1951.2] is . . . to engraft the contract remedy of loss of bargain onto real property law." (*California Safety Center, Inc. v. Jax Car Sales* (1985) 164 Cal.App.3d 992, 999 [211 Cal.Rptr. 39].)

■ For the same reason, evidence introduced by respondents concerning appellant's unsuccessful attempts to sell the property could not properly be considered as an offset. Respondents' damages expert argued that those attempts demonstrated an increase in value that proved no damage resulted from the breach. Even if a sale had been completed, however, any profit on that sale would not reduce the damages attributable to the breach. A breaching tenant cannot claim an interest in the value of the property itself—a value its lease never entitled it to profit from—to avoid the consequences of its own breach. "We hold, therefore, that sale of the property by the landlord following the tenant's abandonment of a lease does not deprive the landlord of its available contract remedies under section 1951.2. The landlord retains the right under section 1951.2 to claim rental loss accruing after the date of sale, except to the extent the breaching tenant can prove the rental loss was avoidable, together with consequential damages under subdivision (a)(4) under standard contract principles." (*Millikan v.*

---

[5] In fact, respondents presented no evidence of fair market rental value. Moreover, the court erred in imposing the burden of proof as to mitigation on appellant, rather than respondents.

*American Spectrum Real Estate Services California, Inc.* (2004) 117 Cal.App.4th 1094, 1104 [12 Cal.Rptr.3d 459].)

■ Because we find the trial court erred in not considering fair market rental value as the appropriate mitigation measure, and erred in allocating the burden of proof, it is highly probable that appellant would have received a more favorable judgment had the proper standard been applied. "An error made by a trial court must be prejudicial to be reversed. An error is prejudicial where there is a good probability, in the absence of the error, the result to the appellant would have been more favorable." (*Finney v. Gomez* (2003) 111 Cal.App.4th 527, 550 [3 Cal.Rptr.3d 604], fn. omitted.)

■ We further find that the matter should be remanded to the trial court only for the purpose of a determination of damages in accordance with section 1951.2. On remand, the burden of proof rests with respondents: "[Section 1951.2] makes clear that the *lessee* has the burden of proving the amount he [or she] is entitled to have offset against the unpaid rent." (Legis. Com. com., 10 West's Ann. Civ. Code (1985 ed.) foll. § 1951.2, p 357.)

4. *The issue of who is the prevailing party is not reached on this appeal*

Respondents did not dispute the lease agreement was breached. Essentially respondents acknowledged liability but sought to eliminate their indebtedness through a legally unsupported damage analysis. Despite the uncontested liability for breach and declaratory relief, the trial court erroneously found in favor of respondents and awarded costs and legal fees in the amount of $214,322.36 to respondents as the prevailing parties.

■ The court in *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136 [70 Cal.Rptr.2d 769] held that "A party can fail to recover a net monetary judgment and yet prevail for purposes of collecting fees in an account founded in contract." (*Id.* at p. 1139.) "Even when no party receives a net recovery, a party may prevail under section 1717." (*Id.* at p. 1152, italics omitted.)

Respondents conceded liability for the breach and yet were awarded attorney fees as the prevailing parties. Because the wrong mitigation of damages standard and burden of proof was applied by the trial court, on remand the trial court must determine which party is the prevailing party.

## *DISPOSITION*

The judgment is reversed and remanded to the trial court in light of our determination appellant was entitled to damages for unpaid rent (applying the fair market rental value standard for mitigation purposes) and for consequential damages. The postjudgment order granting costs and legal fees to respondents is reversed. On remand the court is to determine who is the prevailing party. Appellant is awarded costs on appeal.

Perluss, P. J., and Johnson, J., concurred.

Respondents' petition for review by the Supreme Court was denied September 28, 2005.